IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| ORGLER HOMES, INC. AND DAVID ORGLER,<br><br>    Plaintiff,<br><br>vs.<br><br>CHICAGO REGIONAL COUNCIL OF CARPENTERS, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA AND LOCAL UNION NO. 2087 OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA,<br><br>    Defendants. | Case No. 06 c 50097<br><br>Magistrate Judge<br>P. Michael Mahoney |

## **MEMORANDUM OPINION AND ORDER**

### I. Introduction

Before the court is Plaintiffs' motion to present additional evidence relating to the court's award of fees and costs entered on November 24, 2008. The factual and procedural histories related to this motion are complicated. Parties have briefed the issues at length, have submitted affidavits, declarations, and other evidence, and have engaged in multiple hearings. Because the court's decision is based upon a renewed understanding of the facts, a detailed account of the events leading to this motion is necessary.

### II. Background

In March 2007, an attorney for the plaintiffs, Gerard Smetana ("Smetana"), began

1

discussing with Michael Beilman ("Beilman"), a partner at Mueller Consulting, LLC ("Mueller"), the possibility of Mueller providing expert witness services for Plaintiffs. (Defs.' Resp. to Pls.' Mot. to Reconsider Ex. D.) A series of letters between Smetana and Beilman in late March 2007 discussed the possible relationship, and Beilman began enlisting the help of his employee, Gary Meade ("Meade"), as a "gofer" to obtain information and data for the expert report. (*Id*. at Ex. D–G; Kleeman Aff. ¶ 5, Feb. 4, 2008 (hereinafter "Kleeman Aff.").)

Mueller drafted an Engagement Agreement ("Agreement") and sent it to Smetana on April 4, 2007, who then assisted in drafting the final version. (Defs.' Resp. Ex. H; Smetana Decl. ¶ 4.) A final copy of the Agreement was sent to David Orgler ("Orgler") on April 16, 2007, through his attorney, Smetana. (Defs.' Resp. Ex. K.) The Agreement designated Beilman as the principal investigator, directly supervising and managing the data base. (Kleeman Aff. ¶ 5.) Robert Kleeman ("Kleeman"), of the OnePointe Financial Valuation Group, LLC, would serve as an expert consultant to Mueller, and would be the testifying expert should Plaintiffs need one. (*Id*; Meade Decl. ¶ 1, Jan. 30, 2009 (hereinafter "Meade Decl.").) Also on April 16, 2007, Beilman wrote a second letter to Orgler, which was also sent through Smetana, that listed information he would need to complete the expert analysis. (Defs.' Resp. Ex. L.) Finally, an addendum to the Agreement was sent the following day outlining the required retainer fees for various phases of the analysis. (*Id*. at Ex. M.) Although the letters were sent to Smetana as well as Orgler, all decisions regarding the signed Agreement, fees, and payment terms were agreed upon solely between Orgler and Mueller (Meade Decl. ¶ 6), and all of Mueller's fees were paid directly by Orgler Homes, Inc. (Meade Decl. ¶ 37).

On May 10, 2007, Beilman wrote a letter to Smetana and Orgler explaining that he had received the signed Engagement Agreement from Orgler, but had not yet received the initial

retainer fee. (Defs.' Resp. Ex. O; Meade Decl. ¶ 4.) Again, on May 22, 2007, Beilman wrote a letter to Smetana and Orgler requesting the initial retainer fee. (Defs.' Resp. Ex. P; Meade Decl. ¶ 5.)

Also on May 22, 2007, Beilman sent a fax directly to Orgler stating that he was mailing a copy of the signed Agreement to him. (Defs.' Resp. Ex. Q.) On May 24, 2007, Meade faxed a request to Orgler for the information referenced in the April 16, 2007 letter, which was necessary to prepare for the analysis. (Meade Decl. ¶ 8, Ex. D.) From May 24, 2007 on, Mueller communicated on a day to day basis directly with Orgler. (*Id*. ¶ 9.)

On June 15, 2007, Beilman sent a letter to Smetana and Orgler confirming that Beilman, Orgler, and Meade had met on June 8, 2007 to discuss the project, and that Orgler had delivered the initial retainer fee at that time. (Defs.' Resp. Ex. R.) Also, in June, Meade began compiling data and making field visits to local government and realty agencies to gather information that was necessary to understand the demographic and building trends in Union, Illinois and the surrounding area. (Meade Decl. ¶ 10.)

On July 12, 2007, Meade visited Railway Estates and met with Orgler. (*Id*. ¶ 11.) On July 17, 2007, Meade sent Smetana a status report and requested a meeting to review the initial analysis. (Defs.' Resp. Ex. S.) Smetana wrote a letter back to Meade on July 19, 2007 in which he agreed to a meeting between him, Meade, and Orgler to review the preliminary report, and which he indicated was scheduled to occur during the week of July 30, 2007. (Defs.' Resp. Ex. T.)

On August 2, 2007, Meade met with Orgler in Mueller's St. Charles office, and discussed information that he would need to complete the report. (Meade Decl. ¶ 11; Defs.' Resp. Ex. U.) Meade then faxed a letter to Smetana confirming the needed information discussed at the August

3

2 meeting. (Defs.' Resp. Ex. U.) On August 14, 2007, Meade met with Orgler in Union and Marengo to file a freedom of information request with the local building department, and to tour the local housing developments in Marengo. (Meade. Decl. ¶¶ 11, 15.) On August 24, 2007, Meade again met with Orgler in Union to collect cost data. (*Id*.) Meade stated in his declaration that he did "not consult the attorneys for Orgler Homes Inc. about any" of the July or August visits, either "before or after the visits." (Meade Decl. ¶ 16.) Meade did, however, occasionally send status reports to Smetana. (*see* Defs.' Resp. Exs. S, V.)

During August 2007, Mueller "compiled an MLS data base for relevant transactions in the area, and prepared an initial assessment of housing market trends in the Union [and] Marengo area[s]." (Meade Decl. ¶ 12.) "This assessment described housing trends prior to and after the start of Union picketing." (*Id*.)

On August 29, 2007, the court entered an expert discovery schedule. Plaintiffs' disclosure under Federal Rule of Civil Procedure 26(a)(2) was due November 1, 2007, with corresponding depositions to take place by November 30, 2007. Defendants' rebuttal expert disclosure was due December 31, 2007, with corresponding depositions to take place by January 30, 2008. (Court Doc. 227.)

In early September, Meade, Beilman, Kleeman, and Orgler met to discuss the initial work. (Meade Decl. ¶ 13.) According to Meade, "Smetana attended this meeting for informational purposes only in his role as attorney for Orgler Homes[,] Inc." (*Id*.) At the meeting, Orgler provided Mueller with insight into the housing market and suggested data sources for further investigation. (*Id.*) After the meeting, Meade, Beilman, and Kleeman met and determined the future direction of the analysis. (*Id.* ¶ 14.)

On October 4, 2007, Kleeman met with Beilman in St. Charles, IL to plan the completion

4

of the expert report. (Kleeman Aff. ¶ 6.) Tragically, Beilman was diagnosed with brain cancer on October 17, 2007. (*Id*.) On October 22, 2007, Beilman had surgery. (*Id*.) Kleeman stated in his affidavit that he "was unable to communicate effectively with Mr. Beilman and update [himself] as to the work that [Beilman] had performed[.]" (*Id*.) "A decision was made very late in October that Mr. Beilman could no longer be part of this project, and that [Kleeman] would have to take over." (*Id*.)

Meanwhile, during October, Meade again visited the Orgler Homes development, and met with Orgler to review his internal accounting data. (Meade Decl. ¶ 20.) At that time, Meade began work on the cost analysis portion of the report, and requested more information from Orgler. (*Id*.) On October 23, 2007, Meade sent an email to Orgler following up on a discussion that had occurred the week prior, in which Meade discussed the need for a some more information. (*Id.* ¶ 17, Ex. E.) On October 25, 2007, Meade sent Smetana a status report. (Defs.' Resp. Ex. W.) On October 29, 2007, Orgler emailed Meade back with some of the needed information, which Meade forwarded on to Kleeman to aid in Kleeman's expert report. (Meade Decl. ¶¶ 18, 20, Ex. F.)

On November 1, 2007, Kleeman issued the expert report. (*Id*. ¶ 20.) Prior to issuing the report, Kleeman and Meade met with Smetana to ensure that the report was in the proper format under the court's rules. (*Id*. ¶ 21). According to Meade, "Mr. Smetana did not provide any direction or opinion regarding the content of the report." (*Id.*) Smetana's declaration confirms that he did not participate in the preparation of the report presented by Kleeman. (Smetana's Decl. ¶¶ 6, 9, 10, 12.)

Kleeman's deposition took place on November 28, 2007. (Kleeman Dep. 1.) Smetana was present at the deposition. (Smetana Decl. ¶ 7.) Neither Smetana nor his law firm

represented Kleeman or Mueller at the deposition. (*Id.* ¶ 8.) Because Kleeman and Plaintiffs originally planned to rely on Beilman for testimony regarding the underlying data, Kleeman was unable to answer some questions related to the contract sales dates pertinent to the damages analysis in the expert report. (Kleeman Dep. 112–14; Kleeman Aff. ¶¶ 9–13; Smetana Decl. ¶ 11; Meade Decl. ¶ 22.)

By the second week of December 2007, Kleeman had received a copy of the deposition transcript. (Kleeman Decl. ¶ 6, Dec. 5, 2008 (hereinafter "Kleeman Decl.").) On December 17, 2007, Kleeman asked Meade to gather the data that would answer the questions asked by defense counsel at the deposition, and to perform calculations relevant to the damages analysis using that data. (Kleeman Aff. ¶ 15; Meade Decl. ¶ 23.) Meade did as Kleeman requested, and in the process, discovered an error in the data base used for the expert report that was caused by an incorrect sorting of the data. (Meade Decl. ¶¶ 23, 24; Kleeman Aff. ¶ 15.) Meade informed Kleeman of the error on either December 18, 2007 (Meade Decl. ¶ 24) or December 19, 2007 (Kleeman Decl. ¶ 7),[1] and immediately performed a 100% audit of all data files.

On December 26, 2007, Meade provided Kleeman with a corrected copy of the data base, and on December 27, 2007, Kleeman recalculated the estimated damages figure from the corrected data base. (Meade Decl. ¶ 24; Kleeman Aff. ¶ 17; Kleeman Decl. ¶ 8.) On December 28, 2007, Kleeman instructed Meade to draft an affidavit "to indicate what information he reviewed and how information represented in the corrected data file was sorted to reflect the information requests" (Kleeman Decl. ¶ 9; *see* Meade Aff., Dec. 28, 2007; Defs.' Resp. Ex. Z), to fax Avakian the affidavit, and to overnight the corrected data to Avakian for delivery the

---

[1] Meade's and Kleeman's Declarations have a one day discrepancy as to when Meade informed Kleeman of the error in the data base. This difference is inapposite in this opinion.

following day (Kleeman Decl. ¶ 10; Avakian Decl. ¶ 7). Kleeman called Avakian and informed him that Meade was drafting an affidavit and was going to overnight a corrected data file. (Kleeman Decl. ¶ 10; Avakian Decl. ¶ 7.) At 5:32 PM CST on December 28, 2007, Meade faxed the affidavit to Avakian, who immediately faxed it to defense counsel. (Avakian Decl. ¶ 8.) Avakian also left defense counsel a message in his voice mail informing him of "what [Avakian] knew." (*Id*.)

On Saturday, December 29, 2007, Kleeman completed his analysis of the corrected data and adjusted his damages calculation to reflect the correction without consulting Plaintiffs' counsel. (Kleeman Decl. ¶ 11.) He then drafted a supplement to the expert report and faxed it to Smetana's office. (*Id*. ¶ 12; Kleeman Aff. ¶ 18; Defs.' Resp. Ex. Y.) The next day, he faxed the supplement to Avakian's office. (Kleeman Decl. ¶ 13.) At no point during the preparation of the supplemental report did Kleeman permit Plaintiffs' attorneys "to involve themselves with the preparation of [his] reports." (*Id*. ¶ 16.)

Avakian did not go into the office over the weekend, and first reviewed the corrected data file that Meade sent, as well as the supplemental report that Kleeman faxed, on Monday, December 31, 2007. (Avakian Decl. ¶¶ 9–11.) Avakian prepared a cover letter for Defendants, suggesting that the submission of Defendants' expert report be delayed, and relayed all the information within his possession at that time regarding the supplemental report to defense counsel by 11:01 AM CST on December 31, 2007. (Avakian Decl. ¶¶ 11, 12.) Avakian and defense counsel spoke, and held a telephone conference regarding the supplemental material pursuant to Local Rule 37.2 at about 2:00 PM CST on December 31, 2007. (Avakian Decl. ¶ 13.) Avakian and defense counsel "agreed to disagree over the effect of the [supplemental] report." (*Id*.) At 4:09 PM CST on December 31, 2007, Avakian received a copy of Defendants'

7

expert rebuttal report, as required by the court's deadline. (*Id*. ¶ 14.)

Meanwhile, on December 20, 2007, Smetana left for vacation with his family, at which time he did not have any telephonic communications with Kleeman or anybody else from Mueller. (Smetana Decl. ¶ 15, 16.) He returned to his office on Monday, December 31, 2007 and found Kleeman's fax containing the supplemental report, at which time he called Avakian. (*Id*. ¶¶ 19, 20, 36.) The fax was the first indication to Smetana that "Kleeman had specifically prepared a supplement to his report and [of] certain additional data." (*Id*. ¶ 14.) Smetana did not work with Meade to gather the information that Kleeman requested. (*Id*. ¶ 37.)

On January 2, 2008, Defendants filed a motion under Federal Rule of Civil Procedure 37(c) to strike all the materials submitted by Plaintiffs on December 31, 2007: Kleeman's supplemental report, Meade's December 28, 2007 affidavit, the supplemental data reports, and the revised data files. (Court Doc. 279.) The magistrate judge ordered briefs from both parties on the motion. After considering the briefs, the magistrate judge found that although the supplementation may have been necessary under Rule 26(e), Plaintiffs offered no justification for the error in their first expert report, or the supplement's late disclosure. *Orgler Homes, Inc. et al. v. Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America et al.*, No. 06-C50097, at 5–6 (N.D. Ill. Mar. 6, 2008). According to the court, it was "unclear exactly when, in the 33 days between Kleeman's deposition and the faxing of the supplemental material, the 'corrupted data' was discovered." *Id*. at 3. The court found that the late disclosure "wasted defendants' time and money and upset the discovery schedule which this court [went to] great lengths to enforce." *Id*. at 5. The court further stated the following:

> As to whether plaintiff acted willfully or in bad faith in springing the supplementation on the defense, it is worth noting that Plaintiff[s have] failed to offer any explanation for the timing of [their] supplementation, which happened to take

> place on the very day defendants' expert report was due. What is most troubling to the court is the fact that it remains unsaid when plaintiffs' need to supplement was first discovered, and whether it could have been communicated to defense counsel sooner, thereby mitigating the degree of surprise defense counsel was subjected to. Nevertheless, the suspect timing of the supplementation alone does not constitute bad faith. It was certainly sloppy and perhaps negligent, but probably not willful.

*Id.* at 5.

Because the court found that the supplemental materials substantially changed the damage portion of the case, the court remedied the situation by striking all the experts' materials, including the Plaintiffs' expert report, Plaintiffs' supplemental materials, and Defendants' rebuttal expert report, and ordering Plaintiffs to submit a new, comprehensive expert report by March 13, 2008. *Id.* at 6. The court then allowed Defendants until April 10, 2008 to depose Kleeman and Meade. *Id.* Defendants' new rebuttal expert report was due April 24, 2008, and Plaintiffs were allowed until May 22, 2008 to depose Defendants' expert. *Id.*

To account for the prejudice that Defendants would suffer in re-submitting their expert report in rebuttal to Plaintiffs' "new, comprehensive" expert report, the court ordered Plaintiffs to pay the costs Defendants would incur in submitting their second expert report, deposing Kleeman and Meade on Plaintiffs' new report, and in bringing the motion to strike the supplemental materials. *Id.* Defendants were given until May 1, 2008 to submit a petition for costs and fees to the court, to which Plaintiffs could object by May 8, 2008. *Id.*

Meanwhile, on February 29, 2008, Defendants filed a Motion for Summary Judgment. It was promptly countered on March 10, 2008 with a motion by Plaintiffs to strike Defendants' memorandum and statement of facts in support of the Motion for Summary Judgment. The magistrate judge took the motion to strike the summary judgment materials under advisement. On March 24, 2008, Defendants filed a motion to stay the depositions of Plaintiffs' experts, and

to strike Plaintiffs' new expert report. The magistrate judge took these motions under advisement as well.

On April 30, 2008, Defendants submitted their Third Petition for Fees and Costs, which outlined the costs they incurred in bringing the January 2, 2008 motion to strike. Plaintiffs timely filed their objections on May 8, 2008.

On May 30, 2008, the magistrate judge denied Plaintiffs' motion to strike the memorandum and statement of facts in support of the motion for summary judgment, and denied Defendants' motion to strike Plaintiffs' expert report. *Orgler Homes, Inc. et al. v. Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America et al.*, No. 06-C50097, at 4, 11 (N.D. Ill. May 30, 2008). The court then set a new schedule for the remaining expert discovery, and placed Defendants' Motion for Summary Judgment on a briefing schedule. (Court Doc. 371.) Because Defendants had not yet submitted their second expert report or taken the depositions of Plaintiffs' experts, the court extended the deadline for Defendants to submit a petition for fees and costs associated with those activities. (*Id.*)

On July 9, 2008, the deadlines for taking Plaintiffs' depositions, for submitting their petition for fees and costs, and for briefing Defendants' Motion for Summary Judgment were all extended at the request of the parties. (Court Doc. 382.) The parties were able to keep on track (mostly) with the revised deadlines, and Defendants' Motion for Summary Judgment was fully briefed on August 21, 2008, while Defendants' Third and Fourth Petitions for Fees and Costs were fully submitted and responded to by September 10, 2008.

On September 30, 2008, the district court judge granted Defendants' Motion for Summary Judgment in its entirety. A clerical error, however, closed the case before the magistrate judge could rule on Defendants' Third and Fourth Petitions for Fees and Costs. On

October 10, 2008, Defendants filed a motion with the district court judge pursuant to Rule 59(e) to reopen the case for the purpose of deciding Defendants' Third and Fourth Petitions for Fees and Costs. On October 16, 2008, the district court judge reopened the case by minute order, stating,

> Due to clerical error, this case was closed in this court's order of 9/30/2008. For the limited purpose of resolving defendants' outstanding petitions for fees and costs, this case is reopened. The parties shall set a date for a fee hearing with Magistrate Judge Mahoney within 7 days of this order.

(Court Doc. 426).

In lieu of a fee hearing, the magistrate judge ordered Defendants to supplement their Third and Fourth Petitions for Fees and Costs with an affidavit outlining the fees and costs incurred in submitting their first expert report, and in deposing Kleeman in 2007. (Court Doc. 427.) The court reasoned that by comparing the third and fourth petitions with the last affidavit, it could ensure that Defendants were compensated only for extra work caused by Plaintiffs' December 31 supplement. *Orgler Homes, Inc. et al. v. Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America et al.*, No. 06-C50097, at 4 (N.D. Ill. Nov. 24, 2008). Defendants submitted the affidavit on November 3, 2008, and Plaintiffs submitted a response on November 10, 2008.

On November 24, 2008, the magistrate judge granted in part Defendants' Third and Fourth Petitions for Fees and Costs. *Id*. at 1. The court awarded Defendants $64,382.95 of the $72,877.95 sought for bringing the January 2, 2008 motion to strike, deposing Kleeman and Meade, and for resubmitting their expert report. *Id*. at 8. In that opinion, the court revisited its understanding of the facts. *Id*. at 2–3. The court recalled that Defendants' expert report was due on December 31, 2007, and on "[t]hat same night, Plaintiffs' counsel faxed to defense counsel

11

'supplemental' expert materials consisting of a six page affidavit by Gary Meade, . . . a four page supplemental expert report, thirteen pages of supplemental data reports, and a new ten page MLS spreadsheet." *Id.* at 2. The court reiterated that "Plaintiffs' counsel offered no explanation for submitting the supplement on the very day that [Defendants'] expert report was due[, and that] Plaintiffs' counsel . . . did not reveal when Plaintiffs' need to supplement was first discovered [or] whether Plaintiffs' counsel could have communicated the need to supplement to Defendants sooner." *Id.* at 2–3. The court deemed Plaintiffs' counsels' conduct "certainly sloppy and perhaps negligent." *Id.* at 3. Ultimately, the court found that "Plaintiffs' counsel [was] responsible for the deficiencies in Plaintiffs' first expert report, and the eleventh hour December 31 supplement[,]" and that "[t]he appropriate remedy [was] for Plaintiffs' counsel to reimburse Defendants for the extra expenses incurred due to the submission of the December 31 materials." *Id.* at 5.

On December 5, 2008, Plaintiffs filed a motion to present additional evidence to the magistrate judge in response to the findings of the court articulated in the November 24, 2009 opinion. Plaintiffs' motion challenged the magistrate judge's understanding of the facts, and argued that Plaintiffs' counsel were not responsible for the error in the first report or for the late disclosure of the supplement. (Pls.' Mot. at 7–8, 11–14.) Plaintiffs did not challenge the amount of the award. (Hr'g Tr. 9, Dec. 10, 2008.)

A hearing was held on December 10, 2008, at which Plaintiffs' counsel explained that the experts' primary relationship was with Orgler, and not Plaintiffs' counsel. (Hr'g Tr. 10, Dec. 10, 2008.) Plaintiffs' counsel explained that the experts contacted Orgler directly throughout the engagement (*Id.* at 10–11), that Orgler, and no attorney, signed the contract with the experts (*Id.* at 12), and that the experts' bills went directly to Orgler, who paid the experts himself (*Id.*). The

court adjourned, continued the motion, and instructed Plaintiffs' and Defendants' counsels to confer about the motion under the local rules.

On December 29, 2008, Defendants filed a motion for leave to issue subpoenas for records of Plaintiffs' expert witnesses. Defendants argued that the records would provide the Defendants with a "better understanding of the role played by plaintiffs' counsel in the production and presentation of the plaintiffs' report, and the subsequent supplementations." (Defs.' Mot. for Leave to Issue Subpoenas 2.) On January 7, 2009, the magistrate judge granted the motion for leave to issue subpoenas under the condition that Plaintiffs' counsel have the opportunity to review any documents responsive to the subpoenas for privilege before the documents went to Defendants. (Court Doc. 445.)

On February 18, 2009, the parties reconvened before the magistrate to discuss the materials that Defendants had obtained from the subpoenas. Plaintiffs also sought to supplement their motion with a declaration by Meade, which the court allowed. Defense counsel stated at the hearing that she had reviewed all the materials subpoenaed, and found that they did not "show that [Smetana or Avakian] had anything to do with the delay in supplementing the report on the eve that [Defendants'] rebuttal report was due." (Hr'g Tr. 6, Feb. 18, 2009.) Defense counsel also conceded that no documents proved that the "Excel spreadsheet sorting error had anything to do with anything [that Smetana or Avakian] did." (*Id*. at 8.) Defense counsel did argue that Smetana was instrumental in getting Orgler and the experts together initially, that Smetana attempted to solicit a particular opinion from the expert (one which would help his case), and that status updates provided by Meade to Smetana throughout the process proved Smetana's involvement. (*Id*. at 8; *see* Defs.' Resp. Exs. F, S, V.) The magistrate took the motion to present additional evidence under advisement, and set a briefing schedule. (Hr'g Tr.

13

15, Feb. 18, 2009.)

III. Discussion

The magistrate judge held on March 6, 2008 that Defendants should not have to bear the costs of bringing the January 2, 2008 motion to strike, deposing Plaintiffs' experts on Plaintiffs' new expert report, and drafting a second expert report. On November 24, 2008, the magistrate judge found that those costs equaled $64,382.95, and that Plaintiffs' counsel were responsible for payment. In so finding, the court emphasized that Plaintiffs' counsel failed to explain when the corrupt data was discovered, when Plaintiffs' counsel were made aware of the errors in the report, and what role they played in submitting the supplement to the report. *Orgler Homes, Inc. et al.*, No. 06-C50097, at 2–3 (N.D. Ill. Nov. 24, 2008). The complete lack of explanation offered by Plaintiffs' counsel for the "sloppy and negligent" conduct related to supplementing Plaintiffs' expert report fueled the court's belief that Plaintiffs' counsel were at fault for the late supplement and the prejudice suffered by Defendants. As such, the court held that the responsibility to pay the costs and fees associated with the error in the first expert report and the late supplementation was that of Plaintiffs' counsel.

The evidence presented by the parties since November 24, 2008, though, suggests otherwise. Most of the initial communications regarding retention of Mueller to conduct an analysis for Plaintiffs occurred between Smetana and Beilman. (*see* Defs.' Resp. Ex. D–G; Kleeman Aff. ¶ 5.) Although Smetana played a role in drafting the Engagement Agreement, Orgler signed it and Smetana did not. (Defs.' Resp. Ex. H, K; Smetana Decl. ¶ 4; Hr'g Tr. 10–12, Dec. 10, 2008.) Orgler also paid all the experts' fees, although requests for payment usually went through Plaintiffs' counsel. (Defs.' Resp. Ex. P; Meade Decl. ¶¶ 5, 6; Hr'g Tr. 12,

Dec. 10, 2008.)

After the contract was signed and the retainer paid, almost all of the communications relevant to expert discovery occurred directly between Mueller and Orgler. (Meade Decl. ¶ 9.) Orgler supplied Mueller with relevant information directly. (*Id*. ¶¶ 8, 17, Exs. D, E.) Most of the field work was done by Meade acting alone or with Orgler, but at no time did either Smetana or Avakian help Meade collect data. (Meade Decl. ¶¶ 10, 11, 15, 16, 20; Defs.' Resp. Ex. U.)

Occasionally Meade would send Smetana status reports, but these reports were intended simply to keep Smetana apprised of Mueller's progress on the analysis. (*see* Defs.' Resp. Ex. S.) Sometimes, they would list information that Meade needed (for example, a "list of sale price[s]," or "confirmation that [Mueller's] work product is covered by attorney client privilege.") (*Id*.)

The evidence only reflects three meetings in which Smetana ever participated. The first is a request by Meade in a status report to Smetana that they, and Orgler, meet in late July to discuss the market analysis. (*Id*.) Smetana responded to the request with a letter to Meade, dated July 19, 2007, indicating his intention to attend the requested meeting, which was to take place the week of July 30, 2007. (Defs.' Resp. Ex. T.) According to the Smetana's letter, the purpose of the meeting was to review the preliminary report. (*Id*.) But, absent this status report and Smetana's letter, there is no evidence that a meeting during the week of July 30, 2007 occurred, and if it did occur, there is no evidence that the contents of the meeting were as the letter suggests, or if Smetana's attendance at the meeting contributed in any way to the development of the expert report.

The second meeting is evidenced by Meade's testimony in his declaration stating that, in early September, Meade, Beilman, Kleeman, Orgler, and Smetana attended a meeting where the individuals discussed the initial work. (Meade Decl. ¶ 13.) Meade's Declaration further states,

however, that "Smetana attended this meeting for informational purposes only in his role as attorney for Orgler Homes[,] Inc." (*Id.*)

Finally, Meade's Declaration states that just prior to issuing the report on November 1, 2007, Kleeman and Meade met with Smetana to ensure that the report was in proper format for the court. (Meade Decl. ¶ 21.) Even if this is true, the court is not convinced that Smetana contributed anything of substance to the report when he advised the experts on how to format the document.

In contrast to the three possible meetings attended by Smetana, Orgler met with employees from Mueller often, and communicated with Mueller directly on a day to day basis. (*see* Meade Decl. ¶ 9, 17, 18, 20, Ex. E, F.) Meetings were of a substantive nature, and often involved Orgler helping Meade collect data. (*see* Defs.' Resp. Ex. R; Meade Decl. ¶¶ 11, 13, 15, 16, 20.) All the meetings that occurred between Meade and Orgler in July and August occurred without any consultation with Orgler's attorneys. (Meade Decl. ¶ 16.)

The evidence of Smetana's involvement with the experts compared to the evidence of Orgler's involvement with the experts strongly supports Plaintiffs' argument that Plaintiffs' counsel did not participate in any substantial way in the gathering of evidence for, or the preparation of, the first expert report. In fact, Kleeman wrote an email to Meade on March 29, 2007 expressing staunch resistance to Plaintiffs' counsels' interference in the development of the expert report. (*Id.* at Ex. F.) Defendants argue that this email proves that Plaintiffs' counsel were trying to steer development of the report. The court takes this email to indicate, however, that any attempts by Plaintiffs' counsel to influence the experts were quelled from the start.

Because Plaintiffs' counsels did not contribute to the development or submission of the erroneous first expert report, the only remaining question is whether they were responsible in

16

some way for delaying the submission of the supplement until the very day that Defendants' rebuttal expert report was due.

The relevant time line begins on November 28, 2007, at Kleeman's deposition. Kleeman, stepping in for Beilman, was unable to answer questions at his deposition regarding certain contract dates. (Kleeman Dep. 112–14.) By the second week of December, Kleeman had obtained a transcript of the deposition, and on December 17, 2007, he asked Meade to find the data that would answer the questions presented by defense counsel at his deposition. (Kleeman Aff. ¶ 15; Meade Decl. ¶ 23.) Meade found the error in the data file within the next day or two (*see* Meade Decl. ¶ 24; Kleeman Decl. ¶ 7), and immediately performed a 100% audit of the data files. Then, on December 26, 2007, Meade provided Kleeman with a corrected copy of the data, and on December 27, 2007, Kleeman recalculated the estimated damages figure from the corrected data base. (Meade Decl. ¶ 24; Kleeman Aff. ¶ 17; Kleeman Decl. ¶ 8.) The following day, Kleeman instructed Meade to draft an affidavit (without the help of counsel), to fax Avakian the affidavit, and to overnight the corrected data to Avakian. (Kleeman Decl. ¶ 10; Avakian Decl. ¶ 7.) Kleeman called Avakian to inform him of the situation, which is the first instance suggested by the evidence at which Plaintiffs' counsel was aware of a problem with Plaintiffs' first expert report. (*see* Kleeman Decl. ¶ 10.) As soon as Avakian received Meade's affidavit by fax on December 26, 2007, he faxed it to defense counsel and left defense counsel a voice message in his voice mail. (Avakian Decl. ¶ 8.)

Kleeman finished the supplemental report on Saturday, December 29, 2007, and faxed it to Smetana's office that day. (Kleeman Decl. ¶ 12.) Kleeman faxed the supplement to Avakian's office on Sunday. (*Id*. ¶ 12.) Smetana had been on vacation since December 20, 2007, and did not return to the office until Monday, December 31, 2007. (Smetana Decl. ¶ 19.)

17

Avakian also did not go into the office over the weekend, and did not review the supplemental materials until that Monday. (Avakian Decl. ¶ 9–11.) As soon as he did, though, he prepared a cover letter and sent all the materials to defense counsel by 11:01 AM CST that day. (*Id*. ¶ 11, 12.)

The evidence shows that Plaintiffs' counsel submitted the materials to Defendants at a reasonable time. When Avakian first received information on December 28, 2007 regarding the error in Plaintiffs' first expert report, he passed it on to defense counsel that same day. When he received the full supplement and corrected data files on Monday morning, December 31, 2007, he had them in defense counsel's possession at 11:01 AM that same day, along with a cover letter offering an extension to Defendants. (Avakian Decl. ¶¶ 9–12.) At no time did he or Smetana unreasonably delay passing on the information that they received. Indeed, this point was conceded by defense counsel at the February 18, 2009 hearing. (Hr'g Tr. 6, Feb. 18, 2009.)

## IV. Conclusion

Plaintiffs' motion is well taken. The evidence presented and the arguments raised, both in court and in the parties' briefs, clarifies the court's understanding of the facts related to the submission of the supplemental material. Plaintiffs' counsel were not responsible for the errors in Plaintiffs' first expert report, or the late submission of the supplemental materials. Inasmuch, Plaintiffs' counsel should not be responsible for the costs and fees associated with the supplemental materials. The court modifies its November 24, 2008 opinion such that Plaintiffs' counsel is no longer responsible for the $64,382.95 incurred in bringing the January 2, 2008 motion to strike, deposing Kleeman and Meade, and resubmitting a rebuttal expert report. The Plaintiffs shall remain responsible for the $64,382.95.

ENTER:

_____
P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE:   March 26, 2009